RENDERED: JULY 10, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-1250-ME

E.T.H.  APPELLANT

APPEAL FROM WARREN FAMILY COURT
v.  HONORABLE CATHERINE R. HOLDERFIELD, JUDGE
ACTION NO. 20-J-00281-002

COMMONWEALTH OF KENTUCKY;
CABINET FOR HEALTH AND
FAMILY SERVICES,
COMMONWEALTH OF KENTUCKY;
E.L.H., A MINOR CHILD; AND
K.P.H., MOTHER  APPELLEES

AND

NO. 2024-CA-1251-ME

E.T.H.  APPELLANT

APPEAL FROM FAMILY COURT
v.  HONORABLE CATHERINE R. HOLDERFIELD, JUDGE
ACTION NO. 20-J-00282-002

COMMONWEALTH OF KENTUCKY;
CABINET FOR HEALTH AND
FAMILY SERVICES,

COMMONWEALTH OF KENTUCKY;
S.R.H., A MINOR CHILD; AND
K.P.H., MOTHER                                                              APPELLEES

AND

NO. 2024-CA-1252-ME

E.T.H.                                                                      APPELLANT

APPEAL FROM WARREN FAMILY COURT
v.      HONORABLE CATHERINE R. HOLDERFIELD, JUDGE
ACTION NO. 20-J-00283-002

COMMONWEALTH OF KENTUCKY;
CABINET FOR HEALTH AND
FAMILY SERVICES,
COMMONWEALTH OF KENTUCKY;
C.E.H., A CHILD AND K.P.H.,
MOTHER                                                                     APPELLEES

AND

NO. 2025-CA-1401-ME

E.T.H.                                                                      APPELLANT

APPEAL FROM WARREN FAMILY COURT
v.      HONORABLE G. SIDNOR BRODERSON, SPECIAL JUDGE
ACTION NO. 20-J-00281-002

COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND

FAMILY SERVICES; E.L.H., A
MINOR CHILD; K.P.H.; AND
WARREN COUNTY ATTORNEY                                    APPELLEES

AND

NO. 2025-CA-1403-ME

E.T.H.                                                                APPELLANT

APPEAL FROM WARREN FAMILY COURT
v.     HONORABLE G. SIDNOR BRODERSON, SPECIAL JUDGE
ACTION NO. 20-J-00282-002

COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES; K.P.H.; S.R.H.,
A MINOR CHILD; AND WARREN
COUNTY ATTORNEY                                           APPELLEES

AND

NO. 2025-CA-1405-ME

E.T.H.                                                                APPELLANT

APPEAL FROM WARREN FAMILY COURT
v.     HONORABLE G. SIDNOR BRODERSON, SPECIAL JUDGE
ACTION NO. 20-J-00283-002

COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES; C.E.H., A

-3-

MINOR CHILD; K.P.H.; AND
WARREN COUNTY ATTORNEY                                            APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: THOMPSON, CHIEF JUDGE; L. JONES AND TAYLOR, JUDGES.

THOMPSON, CHIEF JUDGE: E.T.H. ("Father")[1] appeals orders of the Warren
Circuit Court, Family Court Division, which denied his motions requesting that he
be granted custody of his three children.[2] Father argues that the evidence points to
the fact that he is a fit parent; therefore, the children should be returned to him.
After an extensive review of the record and relevant case law, we conclude that the
trial court did not err in denying Father's motions; therefore, we affirm.

**FACTS AND PROCEDURAL HISTORY**

E.L.H., S.H., and C.H. were removed from Father's custody in May of
2020, when Father was arrested for driving under the influence while the children
were in the vehicle. Father has had a long-term substance abuse problem,
including during most of the children's lives. Father stipulated to the neglect of the

---

[1] This case involves allegations of dependency, abuse, and neglect against children; therefore, we
will not use the names of the parties in order to protect the children's privacy.

[2] The mother of the children is not a part of the children's lives.

three children in the dependency, neglect, and abuse ("DNA") actions that are at the foundation of these appeals.

The children were originally placed in the temporary custody of a paternal aunt and uncle; however, due to the aunt and uncle's employment related relocation, the children had to be placed into the custody of the Cabinet in December of 2020. The children have been in the custody of the Cabinet ever since and have been placed in multiple foster homes. On May 16, 2023, Father moved to have the children returned to his custody. A two-day hearing was held[3] and the court heard testimony from five witnesses: Dr. Robert Fane, Father's psychologist who performed a parental capacity assessment on Father and provides ongoing substance abuse counseling to Father; Sandy Jones, Father's friend and landlord; Randi Summerville, the children's therapist; the Cabinet social worker; and Father.

Dr. Fane testified that he believed Father could successfully parent his children and that Father was in remission from his drug dependency. He also testified that his only interaction had been with Father and that he had never met the children. Ms. Jones testified about Father's housing. Ms. Summerville testified that, while the children have made some progress in their therapy sessions, they do not want to return to Father. The social worker testified that she was

---

[3] The hearing took place on December 8, 2023, and January 12, 2024.

concerned about a lack of progress in the family's therapy sessions and that she was unable to speak with Dr. Fane due to Father not providing a release for her to do so. She also testified that she has seen some improvement during Father's supervised visitation, but that sometimes the visits would become chaotic and devolve into arguments. Father testified about his drug abuse and that he began trying to get sober after the children were removed from his custody. Father testified that he had gotten sober, but had a three-week relapse in April of 2023. Father also testified that he is attending an addiction support group on a daily basis.

On September 5, 2024, the court entered orders denying Father's motions. The court did not believe it would be in the children's best interests to return them to Father due to Father's relapse in April of 2023, the fractured relationship he still has with the children, and the length of time the children have been in the Cabinet's custody. Father appealed these orders.

On April 24, 2025, Father filed additional motions seeking the return of his children. A hearing was held on October 3, 2025, during which the court heard testimony from Dr. Fane, Ms. Jones, the children, the Cabinet social worker, and Father. Dr. Fane testified regarding Father's continued sobriety and that he is seeing Father on a regular basis. Ms. Jones testified that Father still has stable housing. The social worker testified that the children should remain in the Cabinet's custody and that further counseling and therapy needs to be done. The

social worker also testified that Father is compliant with his case plan and that his relationship with the children is the only concern. The children all testified in the judge's chambers.[4] They testified that they did not want to return to Father because they were scared he might relapse. They also testified that Father was physically abusive to them in the past and that they could not trust him. They also testified that they did not want to continue family counseling.[5] Further, the children all testified that they wished to stay in their current living situation. Father testified about his continuing sobriety and his desire for the children to return to him.

On October 17, 2025, the court entered orders denying Father's motion. The court held that it was not in the children's best interests to return to Father's custody. The family court concluded as follows:

> There remain serious issues prohibiting return of the children to the father when the children cannot tolerate family counseling with the father. All three children did not like or want to continue family counseling at this time and none of the children were asking to be placed with their father. Until the father's relationship with the children can be significantly repaired it is not in the children's best interest to return to the father's care.

---

[4] At the time of writing this Opinion, the children would be around seventeen years old, sixteen years old, and fifteen years old.

[5] We note that some of the reluctance to continue family counseling was due to it interfering with the children's extracurricular activities.

Father then appealed these orders. This combined appeal stems from the appeal of the September 5, 2024, and October 17, 2025, orders.

## STANDARD OF REVIEW

> This Court's standard of review of a family court's award of child custody in a dependency, abuse and neglect action is limited to whether the factual findings of the lower court are clearly erroneous. Whether or not the findings are clearly erroneous depends on whether there is substantial evidence in the record to support them. If the findings are supported by substantial evidence, then appellate review is limited to whether the facts support the legal conclusions made by the finder of fact. The legal conclusions are reviewed [*de novo*].

*L.D. v. J.H.*, 350 S.W.3d 828, 829-30 (Ky. App. 2011) (citations omitted).

> Since the family court is in the best position to evaluate the testimony and to weigh the evidence, an appellate court should not substitute its own opinion for that of the family court. If the findings of fact are supported by substantial evidence and if the correct law is applied, a family court's ultimate decision regarding custody will not be disturbed, absent an abuse of discretion. Abuse of discretion implies that the family court's decision is unreasonable or unfair. Thus, in reviewing the decision of the family court, the test is not whether the appellate court would have decided it differently, but whether the findings of the family court are clearly erroneous, whether it applied the correct law, or whether it abused its discretion.

*B.C. v. B.T.*, 182 S.W.3d 213, 219-20 (Ky. App. 2005) (footnotes and citations omitted).

-8-

## ANALYSIS

On appeal, Father argues that the evidence showed that he has completed his case plan and is now a fit parent; therefore, the children must be returned to him. He primarily cites to *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 2061, 147 L. Ed. 2d 49 (2000), *Hoskins v. Elliott*, 591 S.W.3d 858 (Ky. App. 2019) ("*Hoskins* 1"), and *Hoskins v. Elliott*, 643 S.W.3d 115 (Ky. App. 2022) ("*Hoskins* 2") to support his argument.

In *Troxel*, the United States Supreme Court analyzed a Washington state statute which allowed anyone to petition the court for visitation of a child. The court could then grant the petition if it was in the best interests of the child. The case arose when grandparents sought to establish visitation with their grandchildren because they wanted more visitation with the children than was being allowed by the parent.[6] The Court held that "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66. The Court further stated that "there is a presumption that fit parents act in the best interests of their children." *Id.* at 68. The Court held that the statute was too broad and did not afford the decision of the parent any significant weight. The Court held that the statute was unconstitutional because "the Due Process

---

[6] One parent was deceased.

Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." *Id.* at 72-73.

In *Hoskins* 1, a mother left her child with a friend named Christy Elliott. Michael Hoskins, the father, later showed up at the Elliott house to retrieve the child. The father appeared to be under the influence of methamphetamines; therefore, Elliott would not give him the child. After three days, the mother had not returned for the child and the Cabinet became involved.

The Cabinet investigation led to a DNA petition being filed against the mother and the child was left with Elliott. The father was not implicated by any claim of abuse or neglect, but the Cabinet did not allow him to have the child because he had drug addiction and domestic violence issues. The court ultimately allowed Elliott to keep the child. Even though the father was not implicated by the DNA action, he was given a case plan by the Cabinet, appointed counsel, and appeared at every hearing in the DNA case. The father eventually completed the case plan.

About eight months after the mother left the child with Elliott, Elliott petitioned the court for custody of the child. The trial court ultimately found that Elliott was a *de facto* custodian, granted her permanent custody of the child, and gave the father supervised visitation. The father challenged the decision by

arguing that Elliott did not meet the requirements of a *de facto* custodian. The trial court did not alter its decision and the father appealed to this Court.

The Court ruled that Elliott did not meet the requirements of being a *de facto* custodian and reversed and remanded for the trial court to consider custody and visitation once again. *Hoskins*, 591 S.W.3d at 863-64. The Court also briefly cited to *Troxel*.

In *Hoskins* 2, upon remand, the trial court granted sole custody of the child to the father, but allowed Elliott to have some visitation. The trial court found that such visitation would be in the best interests of the child. The father appealed the visitation award.

The Court examined the issue with a focus on *Troxel*. The Court held:

> *Troxel* makes it clear: a fit parent gets to decide who is allowed visitation with his child and, absent extraordinary circumstances which certainly are not shown by this record, a court order superseding a fit parent's decision regarding visitation constitutes undue state interference with that parent's constitutionally protected right to make the decision himself.

*Hoskins*, 643 S.W.3d at 117 (citation omitted). The Court found that there was no evidence that the father was an unfit parent and it held that, as long as the father was a fit parent, it was his constitutional right to determine what was in the best interests of his child. *Id.* at 119.

-11-

Taking these three cases into consideration, Father's argument on appeal is that because the evidence points to him being a fit parent, the state can no longer keep his children from him.

We agree with Father that there is evidence in this case which is in his favor. He has completed his case plan with the Cabinet and his psychologist believes he is a fit parent. The Cabinet put on no evidence to the contrary. On the other hand, the evidence that goes against Father is that the children do not want to return to him due to his past behavior. This testimony was testified to by the children themselves and supported by the testimony of the children's therapist.

The cases cited by Father show that parents should generally have custody of their children without state interference; however, these cases do not stand for the proposition that parents should always maintain their custody. *Troxel* states that the state can interfere with a parent's custody under certain "special factors," such as unfitness. *Troxel*, 530 U.S. at 68.[7] This is echoed by *Hoskins* 2. "The 'special factors' to which the Supreme Court refers are those that support terminating parental rights, like unfitness or waiver [of superior right to custody], or those that support curtailing those rights as in a case of dependency, neglect, or abuse." *Hoskins*, 643 S.W.3d at 118.

---

[7] In addition, *Troxel* does not hold that third parties can never seek custody or visitation with a parent's child.

-12-

We believe we have one such "special factor" in the case at hand. Father is part of a DNA action. Chapter 620 of the Kentucky Revised Statutes ("KRS") concerns DNA actions. KRS 620.010 states:

> [T]this chapter shall be interpreted to effectuate the following express legislative purposes regarding the treatment of dependent, neglected and abused children. Children have certain fundamental rights which must be protected and preserved, including but not limited to, the rights to adequate food, clothing and shelter; the right to be free from physical, sexual or emotional injury or exploitation; the right to develop physically, mentally, and emotionally to their potential; and the right to educational instruction and the right to a secure, stable family. It is further recognized that upon some occasions, in order to protect and preserve the rights and needs of children, it is necessary to remove a child from his or her parents.

Since this is a DNA action, we must balance Father's constitutional right to raise his children with the rights of the children to be given a stable home and not be mistreated.

> [W]e must emphasize that, in DNA actions, the fundamental rights of the parents and the statutory rights of custodians must be afforded substantial weight. However, the paramount concern must always be focused on the best interests of the child. The Family Court bears the ultimate responsibility to determine the best interests of the child based upon the evidence presented.

*G.M.A. v. Commonwealth*, 689 S.W.3d 142, 148 (Ky. App. 2024).

In the case of *C.K. v. Cabinet for Health and Family Services*, 529

S.W.3d 786 (Ky. App. 2017), the argument raised by Father was raised by another

parent in a similar situation.

> On the morning of October 20, 2015, seven-year-old M.K.'s home in Maysville, Kentucky was destroyed by fire. Although M.K. managed to escape, the fire claimed the lives of her mother and her brothers. Shortly thereafter, social workers with the Commonwealth of Kentucky Cabinet for Health and Family Services (hereinafter "the Cabinet") secured an emergency custody order granting temporary custody of M.K. to the Cabinet and placing M.K. with her maternal grandmother (hereinafter "grandmother"). M.K.'s father, C.K. (hereinafter "Father"), lives in South Carolina, and neither the Cabinet nor the child's Kentucky family knew Father's contact information. At the time of the fire, Father had not visited M.K. in more than two years.

> One day after securing the emergency custody order, the Cabinet filed a petition alleging dependency in Mason District Court. Father was present at the corresponding temporary removal hearing on October 22, 2015, and he requested custody of M.K. with the intention of eventually taking her back to South Carolina. The district court nevertheless concluded that it was in M.K.'s best interests that grandmother have temporary custody, citing the fact that Father had not visited in-person with M.K. in over two years. In addition, the district court pointed out that M.K. had never been to South Carolina. However, the court ordered a background check on Father and a home evaluation for Father's home in South Carolina. The district court also ordered daily, face-to-face contact between Father and M.K. either in-person in Mason County or via telephone or Skype. Father availed himself fully of these visitation rights.

Following the temporary removal hearing, Father filed a petition for immediate entitlement to custody pursuant to KRS[] 620.110. During a hearing on the petition, the Mason Circuit Court heard extensive testimony from many interested parties and counsel, including Father, Father's wife, grandmother, Meagan Patton, M.K.'s school guidance counselor, and M.K.'s guardian *ad litem* (GAL). Grandmother testified that, prior to the fire, she typically saw M.K. on a daily basis, because her daughter frequently needed her help with child care. Meagan Patton, a social worker with the Cabinet, testified that M.K. had personal items at her grandmother's home and it was obvious that she spent time there prior to the house fire. She also testified M.K. was "probably the most traumatized child I've ever interviewed in my five years of doing this occupation," and Ms. Patton asserted that M.K. needed as many bonds to as many people as possible following her horrific loss.

In his testimony, Father admitted he had not seen M.K. in person since February or March of 2013, but he attributed this fact to the cost of traveling to Kentucky. He also stated that he had repeatedly attempted to call M.K. during that time, but that the child's late mother would not answer his calls. Finally, Father acknowledged on cross-examination that it would not be in M.K.'s best interest to take her back to South Carolina immediately, and he indicated that a period of transition was appropriate. During the case, Father had taken up temporary residence in Mason County where, presumably, he would stay during this transition period.

The circuit court denied Father's petition and issued findings of fact, conclusions of law, and judgment on December 9, 2015. The court made no finding as to Father's fitness as a parent, but stressed that grandmother was M.K.'s only close relative who could be found when M.K.'s mother and siblings died. The circuit court observed that grandmother and M.K. shared a close bond, while Father had not been in his daughter's life for at

least two years. The court acknowledged that Father would likely receive custody of M.K. in the future due to the law's preference for parental custody. However, the court concluded that removing M.K. from grandmother at that time would inflict further trauma on the child. Based on these findings and conclusions, the circuit court held that the district court's award of custody was not clearly erroneous. Upon Father's request, the circuit court amended its factual findings in a supplemental order, but declined to amend its legal conclusions or the ultimate result of the original order.

*Id.* at 786-89. The father then appealed to this Court.

On appeal, citing *Troxel* and other similar cases, the father argued he was constitutionally entitled to the care and custody of his child because he was not declared unfit. The father argued the case should be weighed with an eye toward his constitutional rights and not the best interests of the child. The Court did not agree. The Court held that "Kentucky's dependency, neglect, and abuse statutes, place their emphasis on the health, safety, and overall well-being of the child. This is by design, and it is out of necessity. The custody rights of parents, while important, are not the trial court's priority in such cases." *Id.* at 790 (internal quotation marks and citations omitted). The Court believed leaving the child with the grandmother was in the best interests of the child and that there was substantial evidence to support the trial court doing so. *Id.*

In the case at hand, when issuing the orders being appealed, the family court made its rulings based on the best interests of the children. We believe this

was appropriate. Father lost custody of his children in the first place due to his actions. At the time, it was clear that he was an unfit parent due to his drug addiction. While things have greatly improved, the relationship between Father and the children is still badly damaged. The children made it clear that they did not want to return to Father because of how they were treated when Father was in the throes of addiction.

Should Father's constitutional right to the custody of his children outweigh the best interests of the children in this case? We conclude the answer to this question is no. There is substantial evidence in the record that the relationship between Father and the children is still damaged. Forcing them to live with Father while this relationship is still so fractured would clearly damage their mental and emotional well-being and would fall afoul of the purpose of DNA actions set forth in KRS 620.010.

## CONCLUSION

Based on the foregoing, we affirm the judgment of the family court. While Father's constitutional rights to the care and custody of his children are important and are to be given priority when possible, the damage to the children's mental and emotional well-being would be substantial should they be returned to Father's custody. In this case, the best interests of the children are the priority and the court did not err when basing its rulings on that standard.

-17-

ALL CONCUR.


BRIEFS FOR APPELLANT:

Jonathan Sacks
Bowling Green, Kentucky

BRIEFS FOR APPELLEE CABINET
FOR HEALTH AND FAMILY
SERVICES:

Kevin Martz
Covington, Kentucky